PEOPLE v LUMSDEN

Docket No. 95526. Submitted February 9, 1988, at Lansing. Decided
May 2, 1988. Leave to appeal applied for.

Alan W. Lumsden was convicted following a jury trial in the
Washtenaw Circuit Court of felony murder and armed robbery.
The trial court, Ross W. Campbell, J., sentenced defendant to
life imprisonment for the murder conviction and from sixty to
ninety years imprisonment for the armed robbery conviction.
Defendant appealed.

The Court of Appeals *held:*

1. Certain activities of the defendant justified the search and
seizure of both his person and his truck by the police.

2. The trial court did not err in refusing to suppress the
incriminating statement which defendant gave to the police.
The delay between defendant's arrest and arraignment was not
used to procure the statement. The police did not use coercive
techniques upon defendant. Defendant's statement was volun-
tary.

3. The trial court did not abuse its discretion in denying
defendant's motion to suppress his incriminating statement
based on a claim that he was refused an attorney when he
requested one.

4. Error requiring reversal did not occur when two prosecu-
tion witnesses inadvertently referred to other homicides alleg-
edly committed by defendant. The trial court did not abuse its
discretion in refusing to declare a mistrial based on the wit-
nesses' unresponsive, volunteered answers to proper questions.

5. One cannot be convicted and sentenced for both felony

REFERENCES

Am Jur 2d, Arrest §§ 22 *et seq.*

Am Jur 2d, Criminal Law §§ 551 *et seq.*

Am Jur 2d, Homicide §§ 71 *et seq.*

Am Jur 2d, Trial §§ 682 *et seq.,* 1080.

Am Jur 2d, Witnesses §§ 434 *et seq.*

What constitutes termination of felony for purpose of felony-murder
rule. 58 ALR3d 851.

Effect of voluntary statements damaging to accused, not proper
subject of testimony, uttered by testifying police or peace officer. 8
ALR2d 1013.

murder and the predicate felony where, as here, the predicate felony is punishable by a maximum of life imprisonment. Defendant's conviction and sentence for armed robbery is vacated.

Affirmed in part and reversed in part.

1. Appeal — Preserving Question.

An issue is not preserved for appeal where the issue was not asserted below, either at a suppression hearing or at trial; the Court of Appeals may, however, review newly asserted constitutional issues where a refusal to review would result in a miscarriage of justice, especially where the record is sufficient to allow review and the issue is decisive of the outcome.

2. Arrest — Criminal Law — Arraignment.

A person subjected to arrest without a warrant for a felony must be brought promptly before a magistrate for arraignment on a complaint; an unreasonable delay does not automatically require suppression of any incriminating statements or evidence obtained during the course of the unlawful detention; a confession or other incriminating evidence should be suppressed only where the delay was used as a tool to extract the confession or evidence (MCL 764.13, 764.26; MSA 28.871[1], 28.885).

3. Trial — Motions and Orders — Mistrial.

The test to be used in determining whether a mistrial should be declared is whether the defendant had a fair and impartial trial, not whether there were some irregularities; a mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way.

4. Motions and Orders — Mistrial — Appeal.

The decision to grant or deny a motion for a mistrial lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion.

5. Criminal Law — Witnesses — Motions and Orders — Mistrial.

An unresponsive, volunteered answer to a proper question is not cause for granting a mistrial, especially where the defendant has rejected the opportunity to have the jury charged with a cautionary instruction.

6. Criminal Law — Felony Murder — Predicate Felonies — Multiple Punishment.

A defendant may not be convicted and sentenced for both felony

murder and the predicate felony where the predicate felony is punishable by a maximum of life imprisonment.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *Kirk W. Tabbey,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *P. E. Bennett*), for defendant on appeal.

Before: R. M. MAHER, P.J., and SHEPHERD and K. TERTZAG,* JJ.

R. M. MAHER, P.J. At the conclusion of an eight-day jury trial in the Washtenaw Circuit Court, defendant was found guilty of felony murder, MCL 750.316; MSA 28.548, and armed robbery, MCL 750.529; MSA 28.797. He was thereafter sentenced to life imprisonment for the murder conviction and sixty to ninety years imprisonment for the robbery conviction. He now appeals his convictions as of right. We affirm in part and reverse in part.

During the early morning hours of September 22, 1985, James Visel, a reputed drug dealer, was robbed and killed by three assailants at his home in Ypsilanti, Michigan. The assailants took Visel's jewelry and stock of drugs before murdering him execution-style (i.e., shot in the back of the head at close range, while kneeling with hands tied behind his back).

The next evening (September 23) at 9:30 P.M., Detective Joe Hall of the Washtenaw County Sheriff's Department received an anonymous call from a man who identified defendant as one of the assailants. When asked how he knew this, the caller said: "Well, you just follow it up. You'll find

---

* Circuit judge, sitting on the Court of Appeals by assignment.

out it's true." The caller went on to say that defendant drove a red or maroon pickup truck, model year 1982 or 1983, that defendant could be found at one of three addresses in Washtenaw County, and that defendant possessed a sawed-off shotgun and a pistol, both loaded, which he would not hesitate to use. The caller did not reveal the source of the information, and Detective Hall admitted that, at the time, he had no way of determining its reliability.

On the basis of this information, a stakeout was organized that night. Each of the addresses provided by the caller was placed under surveillance using unmarked vehicles. As Detective Hall and two other officers were making a final check of an address on Pearl Street, they noticed a red Ford pickup truck parked in the driveway. The truck was occupied by a white male. They suspected this to be defendant since an earlier LEIN check of all vehicles owned by defendant revealed that he owned a red 1983 Ford pickup truck. After they watched the truck for a few minutes, it pulled out of the driveway.

As defendant drove past the officers, they were able to observe his license plate number. A check of the number indicated that the truck did indeed belong to defendant. The officers followed defendant for a brief time and he began picking up speed. When defendant ran a red light or stop sign, back-up assistance was summoned. Soon, other police cars—marked and unmarked—joined the chase. The marked car had its emergency lights and sirens activated. The vehicles raced along for about two miles, reaching speeds of up to eighty-five miles per hour. Then, the truck veered sharply left into the oncoming traffic, jumped the curb, flew over a wide ditch and through a fence, flipped over two or three times, and finally came to

rest in a cornfield. Before the police could reach the truck, defendant, who was apparently unharmed, fled into the field. One officer observed a .22 caliber handgun underneath the driver's seat of the truck.

A search of the field was conducted with the aid of several police tracking dogs. After an extensive search, defendant was located and placed under arrest. A search of his person produced some jewelry belonging to Visel. During a subsequent inventory search of the truck, the police found—in addition to the handgun—a syringe, more of Visel's jewelry, and a 12-gauge sawed-off shotgun.[1]

Defendant was brought to the police station at approximately 6:00 A.M. on September 24 and booked on a concealed weapons charge. That charge was later dropped and, in its stead, he was charged with open murder and armed robbery. At the time he was first brought to the station, Detective Hall advised him of his *Miranda*[2] rights and asked whether he would make a statement. Defendant said only that he was tired, had been bitten by the tracking dogs, and wanted to sleep. With this, the interview ended and defendant was allowed to return to his jail cell.

On September 25, at 12:15 P.M., defendant was again brought to the interview room for questioning by Detective Hall. After being advised of his *Miranda* rights a second time, he purportedly indicated that he understood his rights, wished to waive them, and did not want an attorney present. He then proceeded to tell Detective Hall that he, along with Rodney Crawford and Robin Feldman,

---

[1] Neither the shotgun nor the handgun found in defendant's truck was the instrument used to kill Visel. The murder weapon was subsequently found—also on the basis of an informant's tip—in a field near the I-94 expressway in Wayne County.

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

drove to Visel's house during the early morning of September 22 with the intent to rob him. They waited outside until Visel returned home and followed him inside. Using electrical cord, they tied up Visel, his teenage daughter, and her friend. They took Visel downstairs where a safe was located and beat him until he disclosed the combination. Defendant and Feldman removed the jewelry, money, and drugs from the safe and took them outside to the truck. Crawford remained inside with Visel. While loading the truck, defendant heard two gunshots and observed Crawford running from the house. Defendant insisted that he had nothing to do with the shooting.

Shortly after making this statement, defendant was taken before a magistrate for arraignment on the weapons charge. The time was 2:00 P.M. on September 25—approximately thirty-two hours after he was first taken into custody. The next morning, the weapons charge was dropped and he was arraigned on charges of open murder and armed robbery.

Prior to trial, defendant filed a motion for a *Walker*[3] hearing to determine the voluntariness of his confession. He alleged that his statement to the police was involuntary for three reasons: First, defendant was allegedly denied an attorney after requesting one; second, the delay between arrest and arraignment was unreasonable and used to coerce a confession; and third, defendant's injuries and the discomfort suffered at the jail house constituted physical duress. After hearing testimony and arguments on the motion, the trial court denied each of defendant's claims.

Defendant's trial commenced on May 13, 1986, before a jury in the Washtenaw Circuit Court. He

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

was tried on charges of open murder, MCL 750.316; MSA 28.548, and armed robbery, MCL 750.529; MSA 28.797. On May 22, 1986, at the conclusion of an eight-day trial, the jury pronounced defendant not guilty of first-degree premeditated murder and second-degree murder, but guilty of felony murder and armed robbery. On June 27, 1986, defendant was sentenced to life imprisonment for the murder conviction and sixty to ninety years imprisonment for the robbery conviction. The sentencing court let stand both of those sentences despite defense counsel's argument that the robbery conviction was subsumed within the felony murder conviction.

I

Defendant first argues that his arrest was unlawful because it was based upon information received from an anonymous source which was not shown to be reliable. He therefore claims that his inculpatory statements to the police, as well as the physical evidence obtained after his arrest, must be suppressed as "fruit" of the unlawful arrest.

A review of the record reveals that defendant did not assert this claim below, either at the suppression hearing or at trial. Hence, the issue has not been preserved for appeal. *People v Coons,* 158 Mich App 735, 740; 405 NW2d 153 (1987), lv den 428 Mich 900 (1987); *People v Moore,* 144 Mich App 104, 105-106; 372 NW2d 690 (1985). But, we may review newly asserted constitutional issues if our refusal to review would result in a miscarriage of justice. This is especially true where the record is sufficient to allow review and the issue is decisive of the outcome. *People v Snow,* 386 Mich 586, 591; 194 NW2d 314 (1972); *People v Barr,* 156 Mich App 450, 459; 402 NW2d

489 (1986). Here, because the record is sufficiently developed and the issue is outcome-determinative, we will briefly address defendant's claim.

Very simply, defendant misconstrues the basis of his arrest. The informant's tip served only as the impetus for the investigation, not the arrest. Defendant was stopped only after he ran a red light or stop sign, exceeded the speed limit, drove recklessly, attempted to elude the police, and left the scene of his own accident. These unlawful activities justified the search and seizure of both his person and truck. See *People v Laube,* 154 Mich App 400; 397 NW2d 325 (1986), lv den 428 Mich 856 (1987); *People v Ragland,* 149 Mich App 277; 385 NW2d 772 (1986).

II

Defendant also argues that the statement given to the police should have been suppressed because (1) the delay between his arrest and arraignment was allegedly used to extract the statement and (2) his request for an attorney at the time of his arrest was refused. Because these arguments were asserted below, they have been preserved for appeal. However, we do not believe the trial court erred in not suppressing the statement.

The record shows that defendant was taken into custody at approximately 6:00 A.M. on September 24, 1985. At 12:15 P.M. the next day, September 25, he made a statement to Detective Hall wherein he admitted participating in the robbery but denied any involvement in Visel's murder. A couple hours later he was arraigned on charges of possessing the handgun and sawed-off shotgun. This was thirty-two hours after he was first taken into custody. The weapons possession charge was subsequently dismissed upon imposition of charges of

open murder and armed robbery. Defendant was arraigned on those charges sometime during the morning of September 26, 1985.

By statute, a person who is subjected to a felony arrest without a warrant must be brought promptly before a magistrate for arraignment on a complaint. MCL 764.13, 764.26; MSA 28.871(1), 28.885. Failure to promptly arraign violates that person's state and federal due process rights, as well as those rights afforded by the Code of Criminal Procedure. *People v Mallory,* 421 Mich 229, 239; 365 NW2d 673 (1984). However, unreasonable delay does not automatically require suppression of any incriminating statements or evidence obtained during the course of the unlawful detention. *Id.,* p 240; *People v Jackson,* 114 Mich App 649, 654; 319 NW2d 613 (1982). Rather, a confession or other incriminating evidence should be suppressed only where the delay was used as a tool to extract the confession or evidence. *Mallory, supra,* pp 240-241; *People v Rutherford,* 140 Mich App 272, 276; 364 NW2d 305 (1985).

As the trial court correctly found in the instant case, there was no showing that the thirty-two hour delay was used to procure defendant's incriminating statement. When defendant was first brought to the police station, he indicated that he wanted to sleep. The police honored that request and did not attempt to conduct an interview at a time he might have been most vulnerable to coercion. Hence, a large part of the initial delay was due to defendant's request for sleep. Further, he was not immediately arraigned the next morning because of a congested court docket. He was however, arraigned as soon as possible during the afternoon session of court. In addition, there is no indication that the police used coercive techniques upon defendant or that his statement was other

than voluntary. After being refused the first interview, the police did not attempt a second until after defendant was well rested. That interview was preceded by the *Miranda* warnings, which he decided to waive. Finally, as the trial court noted, defendant had substantial past experience with the law and was not easily intimidated:

> [T]he mere length of time itself, until it gets to the point where one would lose hope of arraignment, doesn't strike the Court as being undue, particularly where we have someone as familiar with the legal system and physically and emotionally tough as the defendant. He could do 34 hours standing on his head . . . . Nothing like that is going to intimidate Mr. Lumsden.

We agree with the trial court that there was simply no showing that the delay in defendant's arraignment was used to extract a confession.

As to defendant's claim of being refused an attorney, there is no grounds for reversal. Although he insists that he had requested an attorney when first taken into custody, that allegation was denied by the interviewing police officer. Being an issue of credibility then, we will defer to the trial judge's ability to better determine witness veracity. MCR 2.613(C). The judge found that "the defense witnesses do not instill confidence in the Court" and that the interviewing officer, having no personal interest in the case, was more worthy of belief. The judge also stated that he had "serious reservations as to whether the defendant made a timely request for an attorney." Defendant has presented us with no evidence, other than his bare allegation, that the judge's finding was clearly erroneous. MCR 2.613(C). The judge did not abuse his discretion in denying defendant's suppression motion as to this claim as well.

III

Defendant next argues that the trial court erred in not declaring a mistrial when two prosecution witnesses inadvertently referred to other homicides allegedly committed by defendant. We do not believe these references rose to the level of error requiring reversal.

Allegedly, prior to the robbery and murder of Visel on September 22, 1985, defendant was also involved in a similar robbery-homicide of two people in Dearborn, Michigan. That case, like the instant one, was the subject of community outrage and received much attention from the local media. In an effort not to risk injecting possible prejudice into this trial, the prosecutor warned his witnesses not to make any references to the Dearborn homicides. Despite the warnings, two witnesses inadvertently and briefly mentioned the homicides.

The first reference occurred during the testimony of Washtenaw County Sheriff's Deputy Robert Marsh, handler of one of the police tracking dogs used in the search for defendant. When the prosecutor asked him what information he was acting on when he began the search, Deputy Marsh replied: "Information that he was armed and dangerous; wanted in connection with a homicide, *two homicides* and an armed robbery." (Emphasis added.) The prosecutor immediately asked to approach the bench and an off-the-record conference was held.

At the conclusion of Deputy Marsh's testimony, and out of the jury's presence, the prosecutor stated for the record that the bench conference concerned Deputy Marsh's reference to the other homicides. The trial judge then asked defense counsel whether he wanted a cautionary instruction. Counsel replied that he was in "the old

dilemma for defense counsel" since a cautionary instruction might simply highlight the reference. Although counsel did not believe the reference was innocuous, he stated that he would not ask for a cautionary instruction and would not move for a mistrial because of it.

The second reference was made during the testimony of Deborah Schmidt, codefendant Rodney Crawford's live-in girlfriend. During cross-examination of Schmidt, defense counsel was attempting to impeach her with a prior statement she had made to the police when the following colloquy occurred:

> *Q.* And didn't you also tell Detective Hall that in your statement of the 25th of September that Rodney Crawford told you that Mr. Lumsden had killed Visel?
> *A.* Yes, I did.
> *Q.* And that was not true, either, was it? Rodney Crawford never told you that?
> *A.* Oh, no, wait a minute. What I said to Joe Hall was that *Rodney told me that Alan killed two people in Dearborn* and he told me that he wanted to kill me and Rodney too. [Emphasis added.]

Defense counsel, in an apparent attempt to deemphasize the reference, did not immediately object, but rather, continued the questioning without hesitation. At the conclusion of Schmidt's testimony, defense counsel requested a recess, at which time he expressed concern about her reference to the Dearborn homicides. After first noting that Schmidt's answer was not directly responsive to counsel's question, the trial judge stated that given "the giggling and the childish attitude which she displayed as well as by the answers to the questions and her depraved background [she was an admitted drug addict] . . . I doubt that the jury's

going to give her much credibility anyway on any issue." The judge also made the following observations:

> [T]here is no such thing as a perfectly sterile trial. We deal with human beings and the law modernly is so complex and difficult an application that it's impossible no matter how much caution is exercised and we feel has been exercised in this trial to prevent matters from coming in which we would prefer had not . . . . I should note also that the Prosecutor is not responsible for this although he was obliged to present this witness he, as he stated, has cautioned her against it but he cannot control the kind of witnesses that have to be called in these cases . . . . And since he's obliged to call them, all he can do is to instruct them and if they don't follow those instructions there's very little that the Court can do to enforce them. I don't think a retrial would guarantee that this young woman wouldn't blurt out whatever came into her empty hea—into her head the next time.

For those reasons, the judge ruled that Schmidt's statement was not of sufficient weight to constitute grounds for a mistrial.

There is no dispute that the references to the Dearborn homicides were potentially prejudicial to defendant. The only question is whether they were so egregious as to constitute grounds for a mistrial. We must agree with the trial judge that they were not.

The test to be used in determining whether a mistrial should be declared is not whether there were some irregularities, but whether the defendant had a fair and impartial trial. *People v Spencer,* 130 Mich App 527, 540; 343 NW2d 607 (1983). The decision to grant or deny a mistrial motion lies within the sound discretion of the trial court and will not be disturbed absent an abuse of

discretion. *People v Holliday,* 144 Mich App 560, 571; 376 NW2d 154 (1985), lv den 424 Mich 902 (1986); *People v Green,* 131 Mich App 232, 236; 345 NW2d 676 (1983). But, a mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way. *People v Coles,* 417 Mich 523, 554-555; 339 NW2d 440 (1983). Moreover, an unresponsive, volunteered answer to a proper question is not cause for granting a mistrial. *People v McKeever,* 123 Mich App 533, 538; 332 NW2d 596 (1983), lv den 417 Mich 1100.9 (1983); *People v Stinson,* 113 Mich App 719, 727; 318 NW2d 513 (1982), lv den 417 Mich 957 (1983). This is especially true where the defendant has rejected the opportunity to have the jury charged with a cautionary instruction. See *People v Kiczenski,* 118 Mich App 341, 347; 324 NW2d 614 (1982), lv den 417 Mich 953 (1983).

Here, the references to the Dearborn homicides were not grounds for a mistrial because they were unresponsive, volunteered answers to proper questions. Indeed, they were made despite the prosecutor's attempt to prevent such. Also, both references were very fleeting and were not emphasized to the jury. The record showed that defense counsel skillfully continued the questioning of Schmidt without pause, thus down-playing its significance to the jury. Even had the jury noticed the inadvertent reference by Schmidt, as the trial court noted, it was unlikely she was given much credence given her demeanor. As to the reference by Deputy Marsh, by not even requesting a mistrial at the time it was made, defendant apparently concedes that it did not amount to a mistrial. Finally, had a cautionary instruction been requested, it could have removed the taint, if any, left by the references. As it was, the references were not so egre-

gious that the trial court abused its discretion in refusing to declare a mistrial.

IV

Defendant argues lastly that his sentence for armed robbery must be set aside because that offense is subsumed within the conviction of felony murder. In other words, defendant claims that one cannot be convicted and sentenced for both felony murder and the predicate felony. We agree with that argument, at least where—such as here—the predicate felony is punishable by a maximum of life imprisonment, and, therefore, order that defendant's conviction and sentence for armed robbery be vacated.

In *People v Robideau,* 419 Mich 458; 355 NW2d 592 (1984), our Supreme Court held that, in cases where multiple punishments are sought for a single offense, the question of whether double jeopardy bars multiple punishment is solely one of legislative intent. In so ruling, the *Robideau* Court stated that this analysis is consistent with the result reached in *People v Wilder,* 411 Mich 328; 308 NW2d 112 (1981), wherein it was earlier held that one could not be convicted of both first-degree felony murder and the predicate felony of armed robbery. 419 Mich 489, n 8. The Court reasoned that "[s]ince felony murder is punishable by a mandatory life sentence, while the predicate felonies are punishable by no more than a term of years up to life, it may be inferred that the Legislature intended to punish a defendant only once for committing both crimes." *Id.* Although that reasoning was dictum, and thus technically not binding upon this Court, *People v Riley,* 88 Mich App 727, 731; 279 NW2d 303 (1979), we neverthe-

less choose to follow it since the Supreme Court has unequivocally indicated which way the wind is blowing on that issue.

Accordingly, defendant's conviction of, and sentence for, armed robbery must be vacated. In all other respects, his conviction of felony murder is affirmed.

Affirmed in part and reversed in part.