*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAKOTAH LEE MARTIN,

Defendant-Appellant.

UNPUBLISHED
October 10, 2024
3:14 PM

No. 365861
Ingham Circuit Court
LC No. 21-000926-FH

Before: BORRELLO, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

A jury found defendant, Dakotah Lee Martin, guilty of two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) and (2)(b) (sexual contact by an individual 17 years of age or older against an individual less than 13 years of age). The trial court sentenced defendant to serve 2 to 15 years' imprisonment. Defendant appeals as of right, raising challenges to his convictions based on the great weight of the evidence, ineffective assistance of counsel, inadmissible hearsay, and prosecutorial misconduct. We affirm.

## I. BACKGROUND

This case involves a sexual assault perpetrated by defendant against the minor child NCN. The offense occurred sometime in 2017 when NCN was in the third grade. NCN lived in a house with her parents, siblings, and various members of her extended family. Pertinent to this case was NCN's cousin, CF, who was the same age as NCN, NCN's grandparents, and aunt. This aunt was in a relationship with defendant, who moved into the house between 2014 and 2015, and shared a room with the aunt. Both NCN and CF gave descriptions of the day of the offense. Various details differed and CF acknowledged that he had difficulty remembering the details of that day.

According to NCN, she, her younger brother MCC, and CF decided to play a board game called "Sorry." This game was in defendant and the aunt's room, and the children asked defendant to bring down the game from the top shelf. CF did not recall where the game was kept; he only remembered taking the game, setting it up, and playing. NCN's mother was working, and NCN believed no other adults were awake. NCN testified that, after defendant obtained the game from the shelf, the three children began to play the game at the dining room table, which NCN agreed

-1-

was about as high as her chest area. In contrast, CF indicated that the game had been played at the kitchen table, but he similarly described it as a tall table that would have been about as high as his shoulders at the time of the offense. According to NCN, defendant, who did not play, sat next to her; however, according to CF, NCN sat in defendant's lap, and CF indicated that defendant did play with them. NCN testified that the next thing she remembered was defendant beginning to touch her. He began by touching and groping her breasts before touching and rubbing her thigh and vagina. CF testified that he did not see defendant touch NCN's breasts.

NCN testified that defendant stopped once CF dropped a piece of the game underneath the table. NCN explained that CF went underneath the table and saw defendant touching NCN's vagina. According to NCN, she also went underneath the table, and CF acted surprised and said he was going to disclose what he saw. NCN testified that she told CF not to tell. NCN explained that she had been afraid of something bad happening, of ruining her relationship with her aunt and defendant, and of defendant getting hurt. In contrast, CF testified that he had dropped his stuffed animal on the floor. When he went down underneath the table to retrieve the item, he saw defendant's hand by NCN's vaginal area and rubbing her thigh. Moreover, CF agreed that he and NCN did not have a conversation underneath the table; it was not until after the game was over that they had a conversation about what CF saw.

According to NCN, CF was the first to leave the table, and CF disclosed to adults in the house what he had seen. Although NCN was unsure who CF disclosed to, NCN believed it was her grandparents. According to CF, he and NCN spoke after the game and after defendant left. CF repeatedly asked NCN about whether defendant touched her, and NCN initially denied it before eventually confirming it. CF explained that he subsequently disclosed the sexual assault to the grandmother, who in turn told NCN's mother. NCN testified that she denied the allegations, citing the same fears discussed previously. Defendant continued to live in the house, but NCN tried to avoid him. Defendant was eventually kicked out of the house sometime in 2020, and NCN at this time spoke up and disclosed to CF and another cousin. CF in turn told the other adults in the house.

NCN's mother testified that, before the sexual assault, NCN had enjoyed spending time with family; however, afterward, NCN began to drift away and preferred to be by herself. NCN began seeing a counselor and was continuing to do so at the time of the trial. Before counseling, NCN disclosed to her mother that she tried to cut herself. NCN's mother testified that NCN almost did not seem like the same person anymore. Similarly, NCN's grandmother testified that, after the sexual assault, NCN's behavior and demeanor changed. NCN primarily stayed in the basement, did not like playing with the other kids, and did not want to leave the basement to eat. Furthermore, NCN's school contacted NCN's mother because NCN's laptop had been "red-flagged" for searching for ways to commit suicide.

The prosecutor asked the grandmother about CF's initial disclosure the day of the offense. The grandmother explained that, when CF disclosed what he had witnessed, approximately one to two hours had passed since the offense occurred. CF had been nervous and worried when disclosing. After the grandmother began to testify about what CF told her, trial counsel objected on hearsay grounds. The trial court overruled the objection, reasoning that CF's disclosure was excepted as both a present sense impression and an excited utterance. The grandmother

subsequently testified about CF's disclosure in which CF described dropping an item to the floor, picking it up, and seeing defendant with his hands between NCN's leg and on her vaginal area.

In one particular exchange with the grandmother, the prosecutor asked, "Who was the person who brought [the sexual assault] back up to you?" The grandmother replied, "I think that [NCN] started talking more again to C[F] about that, and *apparently there had been other times that nobody else knew about*." Later, the prosecutor asked, "And how did you feel hearing this information for a second time?" The grandmother replied, "I just felt, like, crushed that I had allowed him to stay in my home and *he continued to do things*." Trial counsel did not object to these questions or answers. On the next day of trial, the trial court and parties agreed to add an instruction for the jury to disregard any testimony about other incidents, i.e., other-acts evidence, which seemingly referenced the grandmother's testimony.

Detective Brittany Roberts, with the Lansing Police Department, was assigned NCN's case. Detective Roberts had extensive experience and training with forensic interviews, and she testified that she had attended and observed NCN's forensic interview. When asked how NCN behaved in the interview, Detective Roberts replied that NCN "was calm, and she was very cooperative. I don't recall anything out of the ordinary happening with that . . . . [A]s the Court saw today, not too far from what you saw earlier. But she's very calm and confident in what she said." Additionally, Detective Roberts agreed that NCN had been "able to answer the questions that were asked of her" and "able to provide detailed information as requested[.]" Detective Roberts was asked if "there [was] anything about [NCN]'s interview that stood out to you as strange or concerning based on your experience with all those other interviews," and Detective Roberts replied, "No." Trial counsel offered no objection to these questions or answers.

On cross-examination of Detective Roberts, defense counsel highlighted various differences between NCN's forensic interview and her trial testimony, including NCN's reasons for not disclosing earlier, how defendant had moved his hand on NCN's body, and whether defendant had played the game with the children. On redirect, Detective Roberts agreed "that depending on how you ask a question might dictate how an answer is given[.]" The prosecutor asked, "If somebody was asked how the hand moved, and one time they said, 'Upward,' and another time they said, 'Up behind my back,' are those necessarily inconsistent in your mind?" Detective Roberts replied, "Not necessarily." Trial counsel did not object to these questions or answers.

During closing remarks, the prosecutor argued that NCN "keeping her secret had its own consequences. [NCN] began struggling in school to the point that her mother decided to hold her back a grade the year after [defendant] sexually assaulted her." Additionally, the prosecutor argued that NCN "started putting distance between herself and her family." Finally, the prosecutor argued that, because of defendant's sexual assault, NCN was "no longer sunshine and rainbows as she described herself as a child" and had "started seeing a counselor to help her cope with the experience and the harm that it caused her, even to the point that she began cutting herself and contemplating suicide." Trial counsel did not object to any of these remarks. The jury found defendant guilty on both counts of CSC-II. This appeal followed.

## II. ANALYSIS

## A. GREAT WEIGHT OF THE EVIDENCE

Defendant argues that his convictions went against the great weight of the evidence. We disagree.

A defendant must move for a new trial to preserve the assertion that the jury's verdict was against the great weight of the evidence. *People v Lopez*, 305 Mich App 686, 695; 854 NW2d 205 (2014). Here, defendant failed to do so, thereby leaving this issue unpreserved. "Unpreserved challenges to the great weight of the evidence are reviewed for plain error affecting the defendant's substantial rights." *Id*. at 695. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To affect substantial rights, the error must be prejudicial. *Id*. An error is prejudicial if it "affected the outcome of the lower court proceedings." *Id*. The defendant bears the burden of showing prejudice. *Id*. Even if prejudice is shown, the reviewing court should reverse only if the "plain, forfeited error resulted in the conviction of an actually innocent defendant" or if the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764, quoting *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993) (quotation marks omitted; alteration in original).

"The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018) (quotation marks and citation omitted). This Court explained that

> [c]onflicting testimony, even when impeached to some extent, *is an insufficient ground for granting a new trial*. [U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of *all probative value* or that the *jury could not believe it*, or *contradicted indisputable physical facts* or *defied physical realities*, the trial court must defer to the jury's determination. [*Id*. (emphasis added; citation omitted; alterations in original).]

This Court reiterated that "[i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses." *Id*. (quotation marks and citation omitted; alteration in original).

Defendant's argument is that NCN's and CF's respective testimony conflicted to such a degree that *both* sets of testimony were deprived of all probative value, meaning that the jury could not consider them. And without any other evidence, defendant contends his convictions should be vacated. Defendant focuses on 10 supposed conflicts between NCN's and CF's respective testimony. But, after review, these 10 supposed conflicts represent minor differences about minor details, such as who played the game and what item CF dropped underneath the table. In fact, many do not represent any differences at all, reflecting that defendant misinterpreted the testimony. Both children were between 9 and 10 years old at the time of the sexual assault, and approximately six years had passed. CF explicitly testified that his memory about the details was not good, easily explaining the reason for the complained of differences. Despite his memory deficits regarding

-4-

the details, CF was confident in his recounting of the sexual assault he witnessed. Defendant ignores this crucial point. Although certain details may have differed, both children were consistent on the most critical aspect of their testimony: that defendant sexually assaulted NCN while playing the board game Sorry. We are unpersuaded that the minor differences identified by defendant deprived the children's testimony of all probative value, prevented the jury from believing their testimony, contradicted indisputable physical facts, or defied physical realities. *Id*. Instead, this is a case in which defendant takes issue with matters of credibility, which are left to the jury's determination. *Id*.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel was ineffective for two reasons: (1) trial counsel failed to move for a mistrial based on the grandmother's testimony concerning other-acts evidence, and (2) trial counsel failed to object to Detective Roberts improperly commenting on and vouching for NCN's credibility. Defendant also maintains that the trial court plainly erred by not sua sponte ordering a mistrial based on the grandmother's testimony. We disagree.

"[A] defendant must move the trial court for a new trial or evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Because defendant failed to do so, "this Court's review is limited to those mistakes apparent on the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). The determination of whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Findings of fact are reviewed for clear error while questions of constitutional law are reviewed de novo. *Id*. Clear error exists when "the reviewing court is left with the definite and firm conviction that a mistake has been made." *Lopez*, 305 Mich App at 693 (quotation marks and citation omitted).

There is a strong presumption that trial counsel " 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,' " *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984), and a defendant has a "heavy burden" to show otherwise, *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009) (quotation marks and citation omitted). For an ineffective assistance of counsel claim to be successful, a defendant must show: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Examination of counsel's actions must be "highly deferential" and without the benefit of hindsight, *Strickland*, 466 US at 689, and there is a "strong presumption" that counsel's actions arose from "sound trial strategy," *Trakhtenberg*, 493 Mich at 52. This Court must not "substitute [its] judgment for that of counsel on matters of trial strategy . . . ." *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). But "a court cannot insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. Instead, "a court must determine whether the 'strategic choices [were] made after less than complete investigation,' and any choice is 'reasonable precisely to the extent that reasonable professional judgments support

-5-

the limitations on investigation.' " *Id.*, quoting *Strickland*, 466 US at 690-691 (alteration in original).

Moreover, this Court reviews an unpreserved mistrial issue for plain error affecting substantial rights and exercises its discretion in deciding whether reversal is warranted. *People v Nash*, 244 Mich App 93, 96-97; 625 NW2d 87 (2000), citing *Carines*, 460 Mich at 763. And "[a] voluntary and unresponsive statement does not ordinarily constitute error." *People v Kelsey*, 303 Mich 715, 717; 7 NW2d 120 (1942). See also *People v Gonzales*, 193 Mich App 263, 266-267; 483 NW2d 458 (1992), quoting *People v Lumsden*, 168 Mich App 286, 299; 423 NW2d 645 (1988) (" '[A]n unresponsive, volunteered answer to a proper question is not cause for granting a mistrial.' "); *People v Stegall*, 102 Mich App 147, 151; 301 NW2d 473 (1980) ("A nonresponsive volunteered answer to a proper question is not cause for granting a mistrial.").

Apart from certain exceptions, former MRE 404(b)(1) generally prohibited the use of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith."[1] If the prosecution *intended* to produce such evidence at trial, it was required to provide written notice at least 14 days prior to trial. MRE 404(b)(2).

In this case, the complained of testimony from the grandmother was volunteered and unresponsive to the prosecutor's questions. The prosecutor did not attempt to elicit testimony about other-acts evidence; rather, she merely asked who it was that had disclosed the sexual assault to her and how this made her feel. Consequently, the prosecutor did not need to provide notice under MRE 404(b)(2). Additionally, because the complained of testimony was volunteered and nonresponsive, a mistrial was not warranted. *Kelsey*, 303 Mich at 717; *Gonzales*, 193 Mich App at 266-267; *Stegall*, 102 Mich App at 151. Furthermore, the exchange was brief, and defendant points to no other portions of the record in which the prosecutor highlighted the unresponsive answers. Given this brief exchange and the witness's nonresponsive answers, trial counsel may have opted not to draw the jury's attention to it by objecting. See *Unger*, 278 Mich App at 242 ("As an experienced attorney, lead defense counsel was certainly aware that there are times when it is better not to object and draw attention to an improper comment.") (quotation marks and citation omitted). Moreover, the trial court provided a curative instruction to the jury about this testimony[2] and "jurors are presumed to follow [the trial court's] instructions," *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Regarding Detective Roberts's testimony, "[i]t is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007).

---

[1] The Rules of Evidence were recently amended. See, e.g., Administrative Order No. 2021-10, ___ Mich ___ (2023), effective January 1, 2024. Given that this case occurred before the effective date of these changes, we will use the version of the rule in effect during trial.

[2] Because the instructions were discussed off-the-record, it is not clear who requested the additional instruction; however, it was prepared by the trial court and defense counsel expressed his appreciation for the "written extra instruction."

Similarly, "[a]n expert may not vouch for the veracity of a victim" of criminal sexual conduct. See *id*.

In this case, Detective Roberts did not comment on NCN's credibility or veracity. She merely testified about NCN's demeanor in the forensic interview, whether anything stood out to her during the interview, whether how a question was framed could dictate what answer was given, and whether hypothetical statements were necessarily inconsistent with each other. Nor did Detective Roberts directly comment on or vouch for NCN's testimony. Compare this with *People v Hawkins*, 507 Mich 949, 949; 959 NW2d 179 (2021), in which the police detective testified that the victim's demeanor was consistent with a child sexual assault victim; opined that, based on his experience and training, the victim's testimony appeared "authentic" to him; that he had been unable to find inconsistencies in the allegations; that this created a good possibility that the allegations were true; and that the defendant's suggestion that the victim had fabricated the "allegations to get her father's attention" was untrue. Without any improper testimony, trial counsel had no reason to object. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) ("[C]ounsel is not ineffective for failing to raise meritless or futile objections."). And we further disagree with defendant that this case represented a one-on-one credibility contest because CF was present and testified about the sexual assault against NCN. Cf. *Hawkins*, 507 Mich at 950 (highlighting no third-party witness or physical evidence).

C. HEARSAY

Defendant argues that the trial court abused its discretion by admitting the grandmother's testimony about CF's disclosure. We disagree.

A trial court's decision to admit or preclude evidence is reviewed for an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). A court abuses its discretion when its decision is "outside the range of principled outcomes." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013). But when "the decision involves a preliminary question of law, which is whether a rule of evidence precludes admissibility, the question is reviewed de novo." *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).

Hearsay is inadmissible unless an exception applies. MRE 802. Under MRE 801(c), hearsay was defined to be "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 803 contains numerous exceptions to the general rule that hearsay is inadmissible. Pertinent to this appeal is the excited utterance exception. Under MRE 803(2), the excited utterance exception permits admission of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." There are two primary requirements for an excited utterance to be admissible: "1) that there be a startling event, and 2) that the resulting statement be made while under the excitement caused by the event." *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998). "[I]t is the lack of [the declarant's] *capacity* to fabricate, not the lack of *time* to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection." *Id*. at 551 (emphasis added). "There is *no express time limit* for excited utterances." *Id*. at 551-552 (emphasis added). "Though the time that passes between the event and the statement is an important factor to be considered in determining whether the declarant was still under the stress of

the event when the statement was made, it is not dispositive." *Id*. at 551. "Physical factors, such as shock, unconsciousness, or pain, may prolong the period in which the risk of fabrication is reduced to an acceptable minimum," and "[t]he trial court's determination whether the declarant was still under the stress of the event is given wide discretion." *Id*. at 552 (quotation marks and citation omitted). The *Smith* Court held that a statement made by a 16-year-old about a sexual assault about 10 hours after it occurred was admissible as an excited utterance. *Id*. at 545, 547-549.

In this case, one to two hours had passed before CF informed the grandmother about the sexual assault. The grandmother described CF as nervous and worried. Moreover, after witnessing the sexual assault, CF immediately spoke to NCN when they finished the game and repeatedly asked her if defendant had been touching her. CF testified that he had felt angry and had a strong desire to disclose because he could not "just let something like that happen." In turn, NCN testified that, underneath the table, CF "was acting surprised" and said, " 'Whoa, I gotta tell.' " The trial testimony supported the trial court's determination that there had been a startling event and that CF's disclosure was made while still under the excitement caused by that startling event. The startling event was defendant's sexual assault of NCN. CF, a child, witnessed defendant's assault and had strong emotional reaction to it, including anger, nervousness, and worry. Under the circumstances, there was little time for reflection or fabrication. And we conclude that the trial court did not abuse its discretion when it admitted CF's statement to his grandmother under the hearsay exception for excited utterances.[3]

## D. PROSECUTORIAL ERROR[4]

Finally, defendant contends that the prosecutor argued facts unsupported by the evidence during his closing. Alternatively, defendant contends that trial counsel was ineffective for failing to object to those remarks. Although we agree with one of defendant's arguments, we nevertheless conclude that he is not entitled to relief.

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant failed to do so, rendering this issue unpreserved. Unpreserved claims of prosecutorial misconduct are reviewed "for outcome-determinative, plain error." *Seals*, 285 Mich App at 21-22. This Court will reverse "only when the plain error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness,

---

[3] Having found no abuse of discretion regarding admission under the excited utterance exception, we need not address defendant's argument that CF's disclosure constituted a present sense impression under MRE 803(1) or the prosecution's argument that it was a prior consistent statement under MRE 801(d)(1).

[4] This Court recognizes that a fairer label for most claims of prosecutorial misconduct is "prosecutorial error," meaning that only the most extreme cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). To the extent that we employ the term "prosecutorial misconduct," we do so only a term of art used in the past.

integrity, or public reputation of judicial proceedings." *Id*. at 22, citing *Carines*, 460 Mich at 764-767.

"The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial (i.e., whether prejudice resulted)." *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). Prosecutorial misconduct questions are examined on a case-by-case basis. *Id*. This Court must review the relevant part of the record and evaluate the prosecutor's statements in context. *Id*. at 272-273. Prosecutors "are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *People v Bahoda*, 402 Mich 261, 282; 531 NW2d 659 (1995). See also *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). But prosecutors are not permitted to argue facts to the jury that are not supported by the evidence produced during trial. *Unger*, 278 Mich App at 241.

In this case, defendant challenges three portions of the prosecutor's closing remarks. In part, the prosecutor argued that, as a result of the sexual assault, NCN struggled in school; started to distance herself from her family; and began to cut herself and contemplate suicide. Defendant contends that during trial, NCN specifically denied that her life was different because of what defendant had done, and, therefore, the prosecutor's arguments were improper. But NCN's mother and grandmother both testified about NCN's behavioral changes after the sexual assault and their testimony amply supported two of the prosecutor's remarks. More specifically, NCN's mother testified that, before the sexual assault, NCN was "happy-go-lucky" and enjoyed spending time with family. But, afterward, NCN began to drift away and preferred to be by herself. NCN's mother described how, before counseling, NCN opened up about trying to cut herself. Moreover, NCN's mother described: "[J]ust seein' how [NCN] is now compared to what she was back then, it's different. It's—it almost feels like that's not my daughter." Similarly, NCN's grandmother testified that NCN's demeanor and behavior changed: NCN preferred to stay in the basement, did not want to come up to eat, and did not want to play with the other kids. And NCN's school flagged her laptop searches for ways to commit suicide. Accordingly, the prosecutor did not make such remarks without evidentiary support, *Bahoda*, 402 Mich at 282, and trial counsel had no duty to raise a futile objection, *Putman*, 309 Mich App at 245.

But we agree with defendant that the evidence did not support the prosecutor's argument that NCN's struggles in school resulted from the sexual assault. Both NCN and her mother testified that the reason NCN repeated the fourth grade was because of reading issues. And NCN's grandmother helped NCN with her reading and indicated that NCN's academic struggles were related to in-home schooling requirements during the COVID-19 pandemic. Even assuming the prosecutor's remark constituted plain error and that trial counsel's failure to object was deficient, reversal is not required. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citations omitted). In this case, the trial court instructed the jury that the attorneys' arguments were not evidence and that the jury must make its decision only on the evidence presented. Moreover, the prosecutor's remarks were brief and involved a minor topic. Moreover, as previously discussed, this case did not involve a one-on-one credibility contest. Both NCN and CF testified about the sexual assault. NCN's mother and grandmother testified about CF's initial disclosure, and NCN's mother and grandmother testified about the drastic changes in NCN's behavior, including self-harm and seeking ways to commit suicide. We are unpersuaded that the prosecutor's singular mention of NCN's school struggles had any meaningful effect on the

jury's decision. Accordingly, defendant is not entitled to relief under the plain-error standard nor has he carried his dual burden of establishing that counsel performed deficiently by failing to object to the prosecutor's remarks and that there was a reasonable probability that the trial's outcome would have been different but for counsel's deficient performance. *Seals*, 288 Mich App at 21-22; *Unger*, 278 Mich App at 238, 242-243.

Affirmed.

/s/ Stephen L. Borrello
/s/ Christopher M. Murray
/s/ Anica Letica